## Rider *versus* Maul and Wife.

1. The admission of a deposition was objected to by defendant on the ground that the statements of the witness were hearsay, and he offered another deposition of the same witness, taken six years afterwards, in which she testified that the statements were hearsay. The court would not then hear the second deposition and admitted the first, saying that they would rule it out, if, when defendant gave his evidence, the first appeared to be hearsay. The second deposition so showed, and the court instructed the jury to disregard the first. *Held*, to be a matter of discretion, and not error.

2. Generally a party is entitled to a full and unqualified answer to his point. But where the point may mislead the jury if not qualified, or the evidence requires, the court should so qualify the answer as to turn the attention of the jury to the true question in the *cause*.

3. Jacobs and Rider bought land together by articles, and made partition: Jacobs gave Rider money to pay the taxes; the whole tract was sold for taxes in 1840; the purchaser assigned his title to Rider; he fraudulently obtained the articles from Jacobs and obtained new articles from the original vendor to himself for the whole; he went into possession, paid the taxes for the whole, and sold part of the Jacobs lot. Jacobs died in 1849, leaving a minor child (the plaintiff), who came of age December 6th 1855; in 1853 Rider obtained from the vendor a deed, which was recorded September 25th 1854. *Held*, that these facts were not notice of a *fraud* or such as would lead to its discovery by reasonable diligence, under the Act of April 22d 1856.

4. The facts would be sufficient notice of a *trustee* not *ex maleficio*.

October 17th 1871. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Jefferson county*: of October and November Term 1870, No. 52.

This was an ejectment, brought July 24th 1860, by Frederick Maul and Mary E. his wife, formerly Mary E. Jacobs, in her right, against John Rider and P. Deitrick, for 300 acres of land in Winslow township.

The case had been three times tried and removed to the Supreme Court; it is reported in 10 Wright 376, 1 P. F. Smith 377, 9 Id. 167. A nonsuit was suffered as to Deitrick.

Both parties claimed under George Latimer, deceased. On the 29th of March 1867, C. C. Gaskill, as agent for Latimer, contracted by articles to sell to John Rider (defendant) and Martin Jacobs (plaintiff's ancestor) the tract in dispute for $600, to be paid, $120 in hand and the residue in four equal annual payments; the purchasers to receive a good title on payment of the purchase-money; 100 acres of the land, it was supposed, might have been sold, and if so, the purchasers were to pay but $400.

Endorsed on the articles were receipts as follows:—

March 22d 1837, $120—from Rider and Jacobs; March 21st 1838, $120—from Rider and Jacobs; March 21st 1839, $60—from Rider; April 30th 1839, $60—from Jacobs; February 28th 1849, $20—from Rider.

[Rider *v.* Maul.]

Endorsed also : " Given up and resold to John Rider 6–9, 1849, Jacobs's part having been sold some years ago for taxes and repurchased from John Philliber by Rider."

Jacobs died in 1849, leaving a widow and one daughter, the plaintiff, who attained full age December 6th 1855, and married the other plaintiff October 5th 1856.

The case was tried February 15th 1870, before Campbell, P. J. For the plaintiffs there was evidence that there had been a division line run between Jacobs and Rider in 1838, Jacobs taking the east part and Rider the west, each began to clear his part of the land ; Rider lived on his part ; Jacobs was there a short time, without residence, and then left and did not return.

C. C. Gaskill testified that about ten years after Jacobs had made his last payment, Rider called on him several times and told him that Jacobs's part had been sold to John Philliber for taxes ; Rider showed him the treasurer's deed to Philliber and Philliber's assignment of it to him (Rider). Gaskill, as agent of Latimer then, at the request of Rider, entered into new articles with Rider alone for the land ; they were dated June 9th 1849, for $317—part in hand and the remainder in three annual instalments ; a good title to be given when all the consideration should be paid.

The plaintiffs offered in evidence the deposition of Anna M. Denhart, regularly taken July 23d 1861. The defendants objected to the admission of the deposition, and to sustain their objection asked to read the deposition of the same witness taken September 7th 1867, in which she testified that many of the statements which she had made in her first deposition were hearsay. The court declined to arrest the cause, and allowed the plaintiffs to read their deposition, saying, " If the defendant can show the evidence to be hearsay when he comes to give in evidence on his part, we can rule it out."

The court sealed a bill of exceptions for the defendant.

In her first deposition, the witness testified that Jacobs advanced the whole money for the first payment of the land at the time of the purchase ; Rider was to pay the taxes of the land because Jacobs had advanced the whole purchase-money for the first payment. Jacobs held the article from Gaskill ; Jacobs died August 1st 1849 ; not long before his death, Rider said to Jacobs that he wanted to borrow money, and wanted the article to give the land for security ; Jacobs gave it to him, saying Rider had as good a right to it as himself, and if he wanted to borrow money he would give it to him.

Margaret Jacobs, widow of Martin Jacobs, testified to the same facts substantially.

There was other evidence that Jacobs made the first payment ; that he gave Rider money to pay the taxes ; that the land had

[Rider *v.* Maul.]

been sold to Philliber for taxes; that Rider had procured Philliber to buy it for him; that Rider said he was the agent for Jacobs; that he had got money from Jacobs to pay taxes, but concluded to let it be and he would lie by for a speculation, and if there was any speculation in it, it was as good for him as for Jacobs, and he got it all into his own hands. There was further evidence tending to show fraud in Rider in the purchase of the land for taxes and in obtaining the article in his own name from Gaskill.

The defendant gave in evidence the deposition of Anna M. Denhart taken in 1867. In that she testified that the statements made in her former deposition were hearsay, having been made to her by Jacobs when Rider was not present. He gave in evidence also the treasurer's deed to John Philliber, dated December 14th 1840, for land assessed in name of Rider and Jacobs, and assignment dated May 9th 1842 from Philliber to himself; deed from Latimer to him, dated January 9th 1853, recorded September 29th 1854. He gave evidence also of a parol partition between himself and Jacobs according to a division line run in 1838 by Winslow; with evidence of possession by the parties according to the line; he testified that from the time of his purchase from Philliber he claimed the whole 300 acres. When he ascertained that it was to be sold for taxes, he informed Jacobs, who would not pay any of the taxes; that after the treasurer's sale Jacobs told him to buy the treasurer's deed, and then he (defendant) would have the whole of the land.

In 1843 the whole 300 acres were assessed to Rider, and he paid the tax on the whole until 1853, when he sold to P. C. Dietrick 100 acres of the part claimed by Jacobs; Latimer made the deed directly to Dietrick.

There was other evidence in contradiction of the plaintiffs' case.

The following are points of the defendant, with their answers:—

3. If the jury believe that James Winslow, in 1838, at the request of the plaintiff's ancestor and the defendant, ran a line which was marked on the ground and agreed upon as a division-line between them, and each took possession of his part in pursuance of such agreement, the tenancy in common was severed, and if the land was afterwards sold for taxes to John Philliber for the non-payment of the taxes of 1839, and by the said Philliber sold to the defendant on the 9th of May 1842, the plaintiff is not entitled to recover any portion of said land.

Answer: "We think the mere running of a division-line and a few days' work by each on his respective end, without residence at all on either end, is somewhat slight evidence on which to find a severance of the tenancy in common. We submit it to the jury, however, and if you find that there was a severance at the time

20 P. F. Smith—2

the tax was assessed, on which the land was sold to Philliber, we answer the point in the affirmative."

4. The defendant, by his article of the 9th of June 1849, which was followed by a deed from the executors of Latimer, on the 19th of January 1853, was placed in no worse situation than Latimer, the owner of the legal title, and if a chancellor would not decree a specific performance by the said Latimer, he could not so decree against the defendant.

Answer: "If Rider procured the Latimer title without fraud, we answer this point in the affirmative; but if he obtained it by fraudulently representing himself to be the owner of Jacobs' interest by a tax sale when they were joint owners of the whole, or if the money had been furnished Rider by Jacobs to pay the taxes and he did not pay them, but suffered the land to be sold and then got the deed assigned to himself, he could not hold the title thus procured to the injury of Jacobs or his heir, and neither he nor his heir would be guilty of laches till he or she had the means of discovering the fraud."

5. The plaintiff's claim being founded on a contract with the executors of George Latimer, dated the 22d day of March, A. D. 1837, on which, after the 3d day of August 1833, neither the plaintiff nor her ancestor paid any purchase-money, nor any taxes, nor took possession, nor did any act indicating an intention to perform said contract, and the defendant on the 9th of June 1849 purchased the land from the executors of Latimer, and after that took possession and improved the same, so that it is greatly increased in value, the plaintiff has been guilty of such laches that a chancellor would not decree specific performance, and he cannot recover.

Answer: "Whether the facts alleged in this point are true or not, is for the jury. But if the plaintiff and her father lay still, and did no act indicating an intention to fulfil the contract, the law is as stated, and we answer it in the affirmative."

5. If the jury believe that Martin Jacobs furnished money to the defendant to pay the taxes assessed upon the land and he did not do so, the purchase by him of the land from John Philliber would make him a trustee for said Jacobs, and the 6th section of the Act of the 22d April 1856 interposes a bar to a recovery.

Answer: "We answer the first part of this point in the affirmative; but the Act of 1856 would not be a bar to the plaintiff's recovery, unless she or her ancestor had notice of the fraud five years before suit brought, or might have discovered it with reasonable diligence."

6. If the jury, under the evidence, find that by the purchase of the land on the 9th of June 1849, the defendant became a trustee for plaintiff's ancestor of the east half of said land, that he took possession and made improvements thereon in 1849, 1850,

[Rider *v.* Maul.]

1851 and 1852, and then sold 100 acres thereof to Dietrick, who in January 1853 took possession, and continued to reside and improve thereon until the commencement of this suit; also, that the defendant put his deed on record on the 28th of September 1854, these are such facts as affect the plaintiff with notice, and the 6th section of the Act of 22d April 1856 will prevent a recovery.

Answer: "The recording of his deed by the defendant from Latimer is neither notice to the plaintiff nor is it a fact from which notice may be inferred, nor is a rumor of such deed a fact from which the plaintiff by due diligence may obtain information of the existence of a hostile title. If the evidence is believed, Jacobs died in the summer or fall of 1849. In his lifetime had he notice of such hostile title? If not, might he have discovered it with reasonable diligence? In order to affect him with this notice, 'there must be some act, some declaration from an authoritative source, which a person would be careless if he disregarded, which is necessary to put a party on inquiry and call for the exercise of reasonable diligence.' At the time of the decease of her father the plaintiff was a minor, and we recollect of no notice to her that she would be bound to regard, or that could reasonably put her on inquiry."

The court further charged: * * *

"The plaintiff offered the deposition of Anna Martha Denhart, taken on a rule of this court at Pittsburg, on the 23d day of July 1861, to which the defendant's counsel objected, and offered another deposition of the same witness, taken on the 13th day of July 1862, to show that certain facts she had testified to in the former deposition were obtained by hearsay from Jacobs, the plaintiff's father, and therefore were not evidence, but only the declarations of the said Jacobs. Owing to the delay and confusion likely to arise in stopping to pick out the obnoxious portions, and the testimony in the defendant's deposition necessary to show the hearsay character of it, we allowed the plaintiff to read the whole of the deposition, and then the defendants having given in evidence their deposition of the same witness showing that part of her former testimony was hearsay, we instruct you that the part recited in defendant's bill of exceptions is not evidence, should be carefully excluded, and have no effect on your minds in making up your verdict." * * *

The jury found for plaintiff 50 acres of land, lying east of the line between the Martin Jacobs lot and the John Rider lot, as run by James Winslow, in 1838, and west of the west line of the Philip Dietrick lot.

The defendant took a writ of error.

He assigned for error:—

1. Admitting the plaintiff's deposition of Anna M. Denhart.

2, 3, 4, 5, 6. The answers to the defendant's points, as given above.

[Rider *v.* Maul.]

*G. A. Jenks* (with whom were *Arthurs, Jenks & Clark*), for the plaintiffs in error.—Incompetent evidence should be excluded as soon as incompetency is discovered: Nash *v.* Gilkeson, 5 S. & R. 352; Shaeffer *v.* Kreitzer, 6 Binn. 430; Ingham *v.* Crary, 1 Penna. R. 389; Delaware & H. Canal Co. *v.* Barnes, 7 Casey 193; Ewing *v.* Alcorn, 4 Wright 492. On the other errors the plaintiffs in error referred to the former reports of this case: 1 P. F. Smith 377; 9 Id. 167.

*David Barclay*, for defendants in error.

The opinion of the court was delivered, October 23d, 1871, by Agnew, J.—The objection to the reading of the deposition of Anna M. Denhart cannot be sustained. The deposition was taken on the 23d of July 1861, and was unobjectionable on its face. The defendant alleged that certain portions of it were only hearsay, and to show this offered a deposition of the same witness taken on the 7th of September 1867, after a lapse of six years. The court declined to suspend the reading of the deposition of 1861 to hear that of 1867, taken by the defendant. Clearly this was a matter of sound discretion, not an error. In a proper case a court may hear an objection from the opposite side to exclude offered evidence. But certainly where a deposition has been fairly taken, and the matter testified to is on its face unobjectionable, a court might well hesitate to exclude it on evidence taken by the opposite party six years afterwards, and when a change of circumstances or other influences may have operated to affect the feelings of the witness or his mind or memory. It would be more conducive to justice in that case to hear the whole evidence, and then exclude the testimony by an instruction to the jury, if the circumstances warrant it. It is said this course may tend to mislead the jury by biassing their minds with that which will turn out to be incompetent. But certainly we are not to suppose the jury will disregard the peremptory instruction of the judge to exclude it as incompetent. Besides, it is not different from many other matters of evidence which appear to be competent when given, and in the subsequent part of the cause turn out to be incompetent. It is every-day experience in the trial of causes that testimony in chief is made to appear to be incompetent by the cross-examination, and yet it is in before the jury. We discover no abuse of the discretion of the court in this instance.

The second error is without foundation, the point of the defendant being affirmed, and the opinion of the court as to the right weight of the evidence did no injury, for the jury evidently found the fact of a partition by the Winslow line, as appears by their verdict.

The third and fourth errors are equally unfounded, both of the

[Rider *v.* Maul.]

points being affirmed.   Of the qualification the plaintiff in error had no right to complain.   The case turned on the question of fraud in the defendant in obtaining the legal title from the Latimers, which would prevent him from standing in the shoes of the vendors, and raising the question of a right to specific performance.   As a general proposition, a party is entitled to a full and unqualified answer to his point.   But when the point may mislead, if not qualified, or when the evidence demands it, it is not only the right but the duty of the court so to qualify the answer as to turn the attention of the jury to the true question in the cause.   It is a mistake to suppose that the course of justice must be turned aside by ingenuity in pointing the judge.   He is bound to hold the balance in an even poise.

The fifth assignment of error in effect asks us to reverse our former decisions in this case, for which we see no reason.

The sixth and last assignment presents the only serious question.   The defendant's seventh point asked the court to say that if the defendant became a trustee for the plaintiff's ancestor of the east half of the tract, went into possession in 1849, and made improvements in that year and down to 1852, then sold 100 acres to Dietrick, who went into possession and made improvements, and continued to reside on the land until the bringing of this suit, the defendant having recorded his deed in 1854, that these facts affect the plaintiff with notice, and the 6th section of the Act of 22d April 1856 will bar her recovery.   When this case was here the last time (see 9 P. F. Smith 167), it was decided that the court below erred in holding that the recording of the defendant's deed was sufficient to put the plaintiff on inquiry. The question now raised is, whether possession of the land from 1849 onward, accompanied by valuable and extensive improvements, together with a title of land to which they can be attributed, are notice in law of the trust, or are such facts as would enable and require the plaintiff, by reasonable diligence, to have discovered it.   But the true question is, not whether these facts are sufficient to bring home a knowledge of a *trust* or to lead to its discovery by reasonable diligence, but whether they are notice in law of the *fraud*, or would have led to *its* discovery by reasonable diligence.   By the 6th section of the Act of 22d April 1856, " no action shall be maintained * * * to enforce any implied or resulting trust as to realty but within five years after * * * such trust accrued with the right of entry, unless * * * such trust shall have been acknowledged by writing to subsist, by the party to be charged therewith within the same period.   Provided that as to any one affected with a trust by reason of his *fraud*, the said limitation shall begin to run only from the discovery thereof, or when by reasonable diligence the party *defrauded* might have discovered the same. * * *   And provided that any person who

[Rider *v.* Maul.]

would be sooner barred by this section shall not be thereby barred for two years from the date hereof." Had there been nothing in this case but a trust, resulting from the relation Rider held to Jacobs as his co-tenant in taking the legal title to himself, doubtless the point should have been affirmed, for Mrs. Maul, the only child of Jacobs (who died in 1849), having arrived at full age in December 1855, before the passage of the Act of 22d April 1856, would have been bound to bring her action within the two years allowed in the second proviso. Had there been no fraud, the facts stated in defendant's seventh point were sufficient to put her upon inquiry as to the alleged trust, and to require her to bring her action in season. But supposing her to have been duly prompted by them, and that she had made inquiry of him as to his title, she would have discovered from him nothing more than that he had bought in the treasurer's deed from John Philliber, on the 9th of May 1842, that he had taken a new contract from Mr. Gaskill on the 9th of June 1849, and obtained his deed from the Latimers in 1853. But it is not to be supposed that he would have disclosed his own fraud—that he would have told her he had money in his hands to pay the taxes when the land was sold, that he had procured the original article from Jacobs on a false pretence that he needed it to borrow money, and that he had led Mr. Gaskill to believe that Jacobs's title was gone by the treasurer's deed, and was abandoned by Jacobs himself, and that he had thus induced Gaskill to give him a new contract on delivering up the old one he had falsely obtained from Jacobs, and to make him a deed on payment of the balance due on the original contract. *Nemo tenetur accusare seipsum.* Yet these are facts it was necessary that the plaintiff should discover in order to reach the defendant's alleged fraud, and it is very clear that the possession and deed of the defendant would not in themselves lead her to a knowledge of them. The clue to find them was to be sought for elsewhere, and there is no evidence that she found it five years before she brought this action. We discover no error in the answer the learned judge gave to the point.

Judgment affirmed.